IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **04-cv-01463-JLK**

**PINE RIVER IRRIGATION DISTRICT, a subdivision of the State of Colorado,**

       Plaintiff,

v.

**UNITED STATES OF AMERICA and
UNITED STATES FOREST SERVICE,**

       Defendants,

**UNITED STATES OF AMERICA,**

       Counterclaimant,

v.

**PINE RIVER IRRIGATION DISTRICT, a subdivision of the State of Colorado,**

       Counterclaim-Defendant.

**UNITED STATES OF AMERICA,**

       Cross-claimant,

v.

**JAMES W. KIRKPATRICK,
LILLIE HOLMES,
ELLA E. MULL,
JOHN F. KIRKPATRICK and
ANY AND ALL UNKNOWN PERSONS WHO CLAIM AN INTEREST IN THE
SUBJECT MATTER OF THIS ACTION.**

       Cross-claim Defendants.

_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**
_____

Kane, J.

This action is brought by plaintiff Pine River Irrigation District ("PRID") against the United States pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, to quiet title to an alleged right of way or easement for a dam and reservoir located at Emerald Lake in the Weminuche Wilderness in southwest Colorado.  The government denies the claimed right of way exists and has counterclaimed against PRID and cross-claimed against four individuals and any and all unknown persons who claim an interest in the alleged right of way, seeking to quiet its title.

The action is before me on the parties' request, pursuant to Federal Rule of Civil Procedure 52, for findings of fact and conclusions of law regarding legal issues raised by the stipulated historical record.  These issues, which will either resolve or limit the scope of this action, include:  whether PRID filed this action within the applicable statute of limitations; whether the disputed right of way was established as claimed under the Act of March 3, 1891 ("1891 Act"), 26 Stat. 1095 (codified at 43 U.S.C. §§ 946-949) (repealed Oct. 21, 1976); and whether the right of way, if established, was either forfeited by PRID's predecessors-in-interest or later abandoned by PRID.  The parties agree that these issues can be decided, without testimony at trial, based on their joint submission of more than 300 historical documents and the stipulated facts they prepared based on this historical record.[1]

## Findings of Fact

Emerald Lake, also referred to as Big Emerald Lake, is located in the rugged San Juan Mountains at an elevation of approximately 10,000 feet.  It is one of the largest natural lakes in Colorado.  A smaller lake, Little Emerald Lake, is located just south and downstream of the

---

[1] Neither party has identified witnesses with personal knowledge of the events reported in the documented historical record.  The parties have also stipulated to the authenticity of the documents in this record.

larger lake.  The two lakes are connected by a small channel, which runs through the narrow

isthmus that separates them.  Water from Big Emerald Lake naturally passes through this

channel, into Little Emerald Lake and then into Lake Creek, which joins the Pine River (also

known as Los Pinos River) some miles downstream, above Vallecito Reservoir.  Both lakes are

located on unsurveyed federal land administered by the United States Forest Service as part of

the Weminuche Wilderness.

The alleged right of way or easement[2] originates with an application submitted to the

United States Land Office in August 1895 by an individual, W.T. Kirkpatrick, for a right of way

for a reservoir to be located at Emerald Lake.  The application, consisting of a map and

accompanying materials, reports that the purpose of the "Emerald Lake Reservoir" would be

"the storing, collecting and preserving of water for irrigation and other purposes."  JE 7

at US 0321(statement of claim for Emerald Lake Reservoir submitted to State Engineer and

Hinsdale County); JE 10 at US 0325 (incorporating same into application to U.S. Land Office).[3]

The application states the reservoir was to be created by construction of a 5-foot dam at the

---

[2]      Originally, the Supreme Court stated that a right of way granted pursuant to the 1891 Act "was neither a mere easement nor a fee simple, but a limited fee on an implied condition of reverter in the event the grantee ceased to use or retain the land for the purpose indicated in the act."  *Kern River Co. v. United States*, 257 U.S. 147, 152 (1921).  Since then, the Court has clarified that the property interest granted under such right of way statutes is an easement rather than a limited fee.  *See Great Northern Ry. Co. v. United States*, 315 U.S. 262, 279 (1942); Solicitor Opinion, 67 Pub. Lands Dec. 225 (1960) (1891 Act rights of way are easments per *Great Northern Railway* decision).  In this opinion, I refer to this easement as a right of way to remain consistent with the terminology of the 1891 Act.

[3]      The designation "JE"in this opinion refers to the Joint Exhibits submitted by the parties.  *See* Parties' Submission of Joint Exhibit List (Doc. 37), Joint Exhibits (Doc. 39), Supplemental Trial Exhibits (Doc. 61).

outlet of Little Emerald Lake that would raise the high water mark of both Emerald Lakes and thus allow water collection and storage in excess of the lakes' natural capacity.

Kirkpatrick submitted his application pursuant to the 1891 Act, which included provisions for granting rights of ways through the public lands and reservations of the United States for irrigation canals, ditches and reservoirs. The 1891 Act provides, among other things, that those seeking to secure the benefits of its right of way provisions must submit a map of the canal, ditch or reservoir for approval by the Secretary of the Interior within twelve months after locating the claimed right of way if the right of way was on land previously surveyed by the federal government, and within twelve months after the federal survey if it was located on unsurveyed land. 1891 Act § 19 (43 U.S.C. § 947). The Act further provided that following the Secretary's approval, the right of way for these improvements would be noted on the relevant plats and thereafter "all lands over which such rights of way pass shall be disposed of subject to such right of way." *Id.*

In 1894, the Department of Interior issued a circular setting out regulations interpreting the right of way provisions of the 1891 Act and explaining how they would be applied. Department of Interior Circular, "Rights of Way - Canals, Ditches, and Reservoirs" ("1894 Circular"), 18 Pub. Lands Dec. 168 (Feb. 20, 1894) (JE 4). Among other things, the 1894 Circular clarified the application and approval procedures for canals, ditches and reservoirs located wholly upon unsurveyed federal lands, such as the Emerald Lake area. The Circular reported that while maps locating 1891 Act rights of way on unsurveyed lands would be received, dated and placed on file in the local Land Office "for general information," they would "not be submitted to, nor approved by the Secretary of the Interior, as the act makes no provision

for approval of any but maps showing the location in connection with the public surveys." *Id.* § 17, 18 Pub. Lands Dec. at 173.  The Department further declared that "[t]he filing of such maps [on unsurveyed lands] will not dispense with the filing of maps after the survey of the lands and within the time limited in the act granting the right of way, which map if in all respects regular when filed, will receive the Secretary's approval." *Id.*

Consistent with these procedures, the record indicates that after the United States received Kirkpatrick's August 1895 application for a reservoir right of way on the unsurveyed Emerald Lake site, it dated them September 5, 1895, and placed the map of the claimed right of way on file "for general information."  JE 8.  There is no indication in the record that the map was forwarded to the Secretary of the Interior for approval or that it was in fact approved by the Secretary.

Kirkpatrick and his associates constructed a dam at the outlet of Big Emerald Lake in the fall of 1895, completing it on or about the end of November.[4]  The dam was constructed with rocks and logs, was approximately five feet in height, and cost an estimated $300 to complete.

In 1895, Kirkpatrick also established Emerald Lake as a fish hatchery.  This development followed the stocking of the Lake with cutthroat trout by Kirkpatrick and members of the

---

[4]      In his August 1995 application, Kirkpatrick represented that work on a dam located at the outlet to Little Emerald Lake was commenced on October 10, 1894.  The parties stipulated, however, that the dam associated with this application was actually constructed upstream of this location, at the outlet of Big Emerald Lake, the following fall.  *See* Updated Stipulated Facts (Doc. 58-2) ¶¶ 32-33.  They further stipulated that another dam was constructed at the Little Emerald Lake location in 1897, but that it washed out several years later.  *See id.* ¶ 35.

Durango Rod and Gun Club in 1888.[5]  The hatchery facility was built at the lower end of the channel between Big and Little Emerald Lakes and was supplied with water via a pipe through the new dam at the outlet of Big Emerald Lake.  According to the Colorado Division of Wildlife, the increased water level in Emerald Lake caused by the new dam was necessary to operate the hatchery.

By 1898, Kirkpatrick was producing at least 200,000 trout fry at the Emerald Lake hatchery.  By 1900, the number of trout eggs and fry produced had increased to over 1 million. By 1902, hatchery operations had grown to include at least two hatchery facilities and a support cabin, and by the following year Kirkpatrick had acquired the title "Fish King" as a result of the hatchery's production.  Some of the trout fry from the hatchery were placed in Emerald Lake to maintain the fishery there.  Although Kirkpatrick allowed the Colorado Department of Game and Fish to take over hatchery operations beginning in approximately 1901, it is undisputed that Kirkpatrick treated Emerald Lake as his private property throughout this period and continued to do so until his death in 1930.

Not long after Kirkpatrick submitted his 1895 application for a reservoir right of way on Emerald Lake, citizens in the area began filing protests with the U.S. Land Office against the application, alleging that Kirkpatrick was not engaged in agricultural pursuits and did not intend to use the reservoir for irrigation purposes, but rather solely sought to control Emerald Lake and its outstanding fishery.  In subsequent protests filed with the Department of Interior and other federal representatives, local government officials and citizens alleged Kirkpatrick was barring

---

[5]     Before this time, the Lake had probably been barren of trout because of natural barriers to migration of fish to the two Emerald Lakes.

the public from the lake and maintaining it as a private fishing resort.  The Department of

Interior dismissed the protests on the ground that Kirkpatrick's application would not be

approved because the Department lacked authority under the 1891 Act to approve rights of way

on unsurveyed lands.  Additional materials submitted by citizens in opposition to Kirkpatrick's

application indicate that they understood that no right of way would be granted to Kirkpatrick

unless and until the land encompassing Emerald Lake was surveyed by the federal government.

Early in 1897, an unnamed citizen applied to the United States Surveyor General for a

survey of the township in which Emerald Lake is located.  In response, citizens in the area

requested that Emerald Lake be excluded from any survey that was conducted in order to prevent

Kirkpatrick from obtaining a reservoir right of way at Emerald Lake.  These citizens alleged that

the waters stored at Emerald Lake were not used or needed for irrigation, as the nearest lands

capable of being watered or farmed had no need of the water for irrigation purposes, and that

Kirkpatrick's right of way application was merely a pretext for maintaining a private, guarded

fishing resort at the lake.  These protests were heeded because rather than completing the

requested survey, the federal government later that year withdrew this township from settlement

and appropriation, based on the opinion of the United States Surveyor General that the township

could not be settled, that the waters of Emerald Lake were not required for irrigation purposes

and probably could not be utilized for such purposes, and that the Lake and its fishery warranted

consideration for National Park status.[6]

---

[6]     The effect of an order of withdrawal is to withhold public lands "from settlement, sale or entry under the general-land laws . . . in order that they may be presently or ultimately applied to some designated public use."  *Bringhurst*, 50 Pub. Lands Dec. 628, 631 (1924); *see Southern Utah Wilderness Alliance v. Bureau of Land Managment*, 425 F.3d 735, 785 (10th Cir. 2005).

In the early 1900's, Kirkpatrick initiated proceedings to acquire a decreed right to store water in the Emerald Lake Reservoir under Colorado water law.[7]  In connection with this effort, Kirkpatrick and associates testified in Colorado water court in August 1902 that while the dam and reservoir at Emerald Lake supported the fish hatchery, the water stored in the reservoir was also was used for irrigation purposes late in the summer season, after hatchery operations for the year were completed.  They testified that the stored water was released from Emerald Lake over the course of two or three weeks by removing one log at a time from the top of the small dam. Once released in this manner, the stored water flowed down Lake Creek to the Pine River, where it raised the river flow perceptively.  Kirkpatrick testified that this raised flow was needed in the late summer to supply water to the headgates of certain irrigation ditches located on the Pine River that served lands he had acquired in the area beginning in 1900.

Kirkpatrick testified that before he acquired these lands, water released from Emerald Lake in late summer, after hatchery operations were concluded, was available to anyone who drew water from the Pine River for irrigation purposes and "happened to get it into their ditches."  JE 29 at US 0406.  He also testified, however, that the additional water from Emerald Lake was not needed to meet irrigation or other needs before 1902 because the natural flow of the river, without the stored water released from Emerald Lake, was sufficient to meet users' needs.

---

[7]     The determination and enforcement of water rights under state law is a separate matter from the determination of a water-related right of way across federal lands pursuant to the 1891 Act or other federal right of way statutes.  *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 410-411 (1917).  Accordingly, the state water storage right that was finally decreed in 1934 as a result of these proceedings did not and could not include any right to use the federally owned lands on which the Colorado water storage right was to be exercised.  *See id.*; *Dalton Wilson/Don Bowman*, 156 IBLA 89, 94 (2001).

John B. Harper, a civil engineer and the government Superintendent of Irrigation, testified at the hearing that the Emerald Lake Reservoir was not currently operated to store a large amount of water for irrigation.  In order to serve this purpose, he testified, it would be necessary to modify the method of releasing water from the dam to allow valves and other devices to regulate and measure the amount of water released to ensure that it was released and used in accordance state water right priorities.

Neither Kirkpatrick nor anyone else testifying at the 1902 hearing identified any specific lands irrigated by the water stored in Emerald Lake other than Kirkpatrick's recently acquired properties.  Nor is there evidence in the record that Kirkpatrick owned or controlled any irrigable lands capable of being served by waters from Emerald Lake before these 1900-1902 land acquisitions.  Kirkpatrick nonetheless testified that the main purpose of the Emerald Lake dam and reservoir from inception was storage of water for irrigation, and that the support they provided to the Emerald Lake fish hatchery was merely incidental to this irrigation use.

The record indicates that in the years following this proceeding, local citizens continued to dispute that water stored in Kirkpatrick's Emerald Lake Reservoir could be used for irrigation given the dam's construction and location.  These citizens maintained that the primary purpose of the dam and reservoir was to support the Emerald Lake fish hatchery and to promote Kirkpatrick's private fishing and summer resort at the Lake.

In 1907, the land encompassing Emerald Lake became part of the national forest reserve. Shortly thereafter, the Forest Service launched an investigation into the reservoir at Emerald Lake and its status, and concluded that it was unlikely it had ever been used for irrigation purposes, but had been used to support the fish hatchery and a private fishing resort.  The Forest

Service also confirmed that Kirkpatrick's 1895 application for a reservoir right of way had been accepted for general information only, and not approved by the Secretary of Interior, because the land was unsurveyed.

In late 1914, the Departments of Interior and Agriculture enacted a joint regulation that addressed applications under the 1891 Act for rights of way on unsurveyed lands.  The regulation noted that the 1891 Act did not authorize the creation of rights of way on unsurveyed lands, and therefore declared that a right of way application under the Act on such lands would be deemed an application for a special use permit to occupy and use the lands indicated on the application.  The regulation further directed that the permit should be issued unless there were good reasons to disapprove the application.

Following promulgation of this regulation, the Forest Service renewed its investigation into the status of Kirkpatrick's 1895 application for a reservoir right of way on Emerald Lake. This investigation again confirmed that the right of way requested was on unsurveyed land and therefore had never been approved.  Forest Service investigators also reported that Kirkpatrick had used the Emerald Lake Reservoir for fish culture purposes and not for irrigation.  They concluded that Kirkpatrick "of course, never had an easement for a right of way, since the territory wherein it is located is unsurveyed, and the irrigation right of way acts do not apply on unsurveyed lands."  JE 293 at US07-0061.

After becoming aware of the Forest Service investigation, Kirkpatrick and B.W. Ritter, an associate who had also filed for a right of way on Emerald Lake under the 1891 Act, met with the Acting District Forester in the fall of 1915.  In a subsequent letter to the Forest Supervisor, the Acting District Forester reported he had responded to a question from Ritter by informing

him, and presumably Kirkpatrick as well, that an easement could not be granted under the 1891

Act because the land was unsurveyed.  When Ritter inquired whether he should file some sort of

relinquishment to clear up title to the land, the Forest Service official told him there was nothing

to relinquish.  At this same meeting, the Acting District Forester reported that Kirkpatrick

maintained that he used the reservoir for irrigation purposes and stated that he was "very

desirous of obtaining a permit to cover his occupancy of National Forest lands" for these

purposes.  JE 298 at US07-0050-50.

Following this meeting, the Forest Service determined that since 1905 water had been

released from Emerald Lake to the Pine River by removing logs from Kirkpatrick's dam in the

late summer.  The Forest Service's report does not indicate whether the released water was

needed or used for irrigation purposes, but does note that the buildings present at the dam site

were not needed or used in connection with irrigation purposes, but were instead related to the

ongoing fish hatchery operations.

On December 9, 1915, the Forest Service issued a special use permit to Kirkpatrick for

maintenance of the reservoir described in his 1895 right of way application.  The permit was

issued in accordance with the 1914 joint regulation for disposition of applications for rights of

way upon unsurveyed national forest lands.

On the same day, the Assistant District Forester sent Kirkpatrick a letter referencing his

1895 right of way application under the 1891 Act and stating: "The said Act does not authorize

the approval of applications for rights of way over unsurveyed lands."  JE 301 at US07-0046.  It

further stated, "[h]owever, under the joint regulations of the Department of Agriculture and the

Department of Interior, dated November 5, 1914, your application to the latter Department for an

-11-

easement right of way is taken by the Forest Service as an application for a special-use permit, and a permit has accordingly been issued to you and is enclosed herewith." *Id.* The enclosed permit authorized Kirkpatrick to use the land described in his 1895 right of way application as a reservoir "for the purpose of irrigation." JE 108 at US 0633. It also stated that the permit was not transferable and would terminate upon breach of any of the conditions therein or at the discretion of the Forester.

Two years later, in a letter dated November 2, 1917, the Forest Service informed Kirkpatrick that it had recently learned he had disposed of the lands irrigated by waters impounded at Emerald Lake pursuant to his 1915 special use permit. Unless Kirkpatrick could demonstrate that this report was in error, the Forest Service declared it would terminate the permit within 30 days because it was not transferable and was only valid as long as beneficial use was being made pursuant to it. Three weeks later, Kirkpatrick and his wife executed a quit claim deed conveying all of their interests in the Emerald Lake Reservoir to B.W. Ritter.

After confirming to the Forest Service that Kirkpatrick had disposed of all of his interests in the downstream lands and in Emerald Lake as well, B.W. Ritter persuaded the Forest Service to issue a special use permit to him personally for use of the Emerald Lake Reservoir for irrigation purposes. Accordingly, the Forest Service notified Kirkpatrick on December 26, 1917, that it had closed the special use permit issued to him in response to his 1895 right of way application, and had issued a new permit to Ritter. Ritter's permit contained the same restrictions as the 1915 permit previously issued to Kirkpatrick.

Through a series of transactions with B.W. Ritter and his son, Paul Ritter, Kirkpatrick regained a 3/4 interest in whatever rights, title or interest existed in Emerald Lake as result of his

1895 efforts under the 1891 Act.  Kirkpatrick held these interest from 1918 until his death in 1930.  During this time, Kirkpatrick continued to prevent public fishing at Emerald Lake.

The Emerald Lake fish hatchery ceased operations sometime in the late 1920's.  In April, 1932, the Forest Service closed the special use permit it had issued to B.W. Ritter for maintenance of a reservoir at Emerald Lake.

Also in 1932, B.W. Ritter's son, Paul Ritter, submitted a statement of claim to the State of Colorado Water Court for La Plata County for the purpose of supplementing Kirkpatrick's unresolved 1902 state water right claim to waters impounded in the Emerald Lake Reservoir.  In his statement, Paul Ritter represented that he and Kirkpatrick's four heirs were the current owners of the reservoir.  The court accepted Kirkpatrick's filing as supplemented by Paul Ritter, and decreed a water storage right for sufficient water to fill the reservoir to a height of five feet above the natural lake level, provided the water was available and not otherwise appropriated. The court decree also stated that the claimants and their predecessors had made water stored in Emerald Lake Reservoir available for irrigation from the Pine River during dry years and that they, their predecessors and others had used the stored water for this purpose during such years. This is the only evidence in the record that any waters stored in the Emerald Lake Reservoir were used for irrigation purposes after Kirkpatrick disposed of his Pine River valley properties in 1917.

In 1940, Paul Ritter conveyed his 1/4 interest in Kirkpatrick's 1895 Emerald Lake right of way application to PRID, a subdivision of the State of Colorado that operated the Vallecito Reservoir on the Pine River downstream of its confluence with Lake Creek.  The remaining 3/4 interest, then and now, is held by four individuals, cross-claim defendants James W.

-13-

Kirkpatrick, Lille M. Holmes, Ella E. Mull and John F. Kirkpatrick, who are W.T. Kirkpatrick's heirs.  It is undisputed that Kirkpatrick is the predecessor-in-interest to PRID and each of these individual claimants with respect to any of their rights, interest or title to Emerald Lake and the right of way claimed there.  At some point, PRID also acquired all or part of the water storage right for Emerald Lake Reservoir separately decreed by the Colorado water court.

After acquiring its interest in the alleged Emerald Lake Reservoir right of way in 1940, PRID applied for and received a special use permit from the Forest Service relating to use of Emerald Lake as a reservoir.  The following year, PRID Board members and a Colorado state engineer from the local irrigation district visited the site to determine the work necessary to repair the dam and outlet works.  They discovered that the dam was largely washed out, and that water was passing through, under and around what remained of it.  When PRID had not rebuilt or repaired the dam by 1949, the Forest Service cancelled PRID's special use permit.

In 1951, PRID tore out the remainder of the dam and natural log jams in its vicinity in order to allow any impounded waters from Emerald Lake to be released and ultimately impounded in the downstream Vallecito Reservoir.  The dam was never rebuilt, and in 1973 the Colorado Irrigation Division Engineer for the area reported that the original dam had washed away and that the Emerald Lake reservoir was now a natural lake.  Subsequent site visits by the Colorado Division of Wildlife and others confirmed there is little evidence remaining of the primitive dam that once existed at Emerald Lake.

In 1975, Congress designated the Weminuche Wilderness as a wilderness area under the Wilderness Act.  The designated wilderness area included Emerald Lake.  In a 1968 report regarding the proposed wilderness designation, the Forest Service described Emerald Lake as a

natural lake in a primitive environment.  While the report noted the existence of several reservoir easements within the proposed wilderness area, it did not include an easement on Emerald Lake on this list.  In 1977,  Forest Service officials also investigated whether any right of way easement existed regarding Emerald Lake and, after examining the historical record, determined that none existed and that all related special use permits had expired.

In 1980, PRID notified the Forest Service that it wished to do some survey work and possibly erect a dam at Emerald Lake, and requested information on how to obtain a special use permit for these purposes.  PRID did not reference the reservoir right of way it now claims in this letter.  Forest Service officials confirmed at a subsequent meeting that a special use permit would be necessary in order to build a dam on the lake.

In October 1980, PRID submitted an application "[t]o construct an addition to the present dam for purpose of storing decreed water, which we own."  JE 177.  PRID stated the dam addition would be approximately twenty feet tall and that it wished to begin construction in the spring of 1981.  In January and March of 1981, the government sent PRID several letters notifying it that additional information was necessary for it to respond to the permit application. PRID did not respond to these requests, and as a result the Forest Service took no action on PRID's application.

On July 1, 1984, the State of Colorado Division Engineer for Water Division 7 identified PRID's water storage right on Emerald Lake as an abandoned right, and gave PRID until December 31, 1984, to protest this determination.  PRID did not do so.  As a result, on June 30, 1987, the Colorado District Court for Water Division 7 determined that PRID had abandoned its state water storage right at Emerald Lake.

Five years later, in September 2002, PRID and the Southern Ute Tribe applied to the State of Colorado for a new water storage right at Emerald Lake, based on the proposed construction of a new dam either 30 or 50 feet in height.  PRID reports these proceedings were dismissed without prejudice pending the determination of title to the reservoir right of way claimed in this case.

On July 16, 2004, PRID filed this action to quiet title in the right of way originally sought by W.T. Kirkpatrick in 1895.  The United States has counterclaimed and cross-claimed to quiet its title against PRID, the other four stipulated owners of any interest in Emerald Lake arising from Kirkpatrick's 1895 efforts to establish a right of way under the 1891 Act, as well as and any and all unknown persons who claim an interest in the alleged right of way.

A disputed factual issue that is material to determination of these claims is the use made of the waters impounded in the Emerald Lake Reservoir from 1895 to the present.  Based on the historical record, the parties' stipulated facts and the findings stated above, I find that these waters were initially used to support the fish hatchery Kirkpatrick built between Emerald and Little Emerald Lake and the private fishing resort Kirkpatrick maintained and enforced at Emerald Lake.  This conclusion is based on the undisputed evidence that the Emerald Lake Reservoir and dam were necessary to and utilized in hatchery operations; the evidence that Kirkpatrick maintained Emerald Lake as a private fishing reserve; the lack of evidence that Kirkpatrick owned any agricultural lands that could be served by waters stored in the reservoir until five years after the dam and reservoir were built; the lack of evidence that other identified lands were irrigated with waters released from the reservoir or that the water stored there was needed for this purpose; the undisputed fact that the dam was not constructed with headgates or

equivalent devices ordinarily used to release stored waters for irrigation purposes; and the contemporaneous citizen reports that water stored in the reservoir was not being used for irrigation and was not in fact needed for irrigation purposes along the Pine River.

In so finding, I have considered Kirkpatrick's testimony at the 1902 water court proceedings that during this early period water stored in the Emerald Lake Reservoir was released to the Pine River for a two to three week period after hatchery operations had concluded, and thus was available to anyone on the river who happened to draw this additional water into their irrigation ditches. This testimony, coupled with Kirkpatrick's acknowledgment that the Pine River up to that point had sufficient flow to meet all irrigation needs without the addition of reservoir waters, at best supports a finding that some landowners along the Pine River might have unknowingly and unnecessarily drawn waters released from the Emerald Lake Reservoir into their irrigation ditches during the short period that water released from the reservoir was present in the river. It is clear from the record, however, that any such irrigation use of these waters was fortuitous and was not the exclusive or even the main purpose of the reservoir.

Beginning in approximately 1900, after Kirkpatrick acquired agricultural lands in the Pine River valley downstream from Lake Creek, water stored in the reservoir was utilized for late season irrigation of these lands. The main purpose of the reservoir, however, remained support of the fish hatchery and Kirkpatrick's private fishing resort at Emerald Lake. This conclusion is based, again, on the design of the dam, its continuing use to support the fish hatchery and Emerald Lake fishery and the fact that the timing of any irrigation-related releases

through the removal of logs in the dam was dependent on when hatchery operations were concluded for the season.

Annual late season irrigation use of waters impounded in Emerald Lake may have continued on Kirkpatrick's agricultural lands until approximately 1917, when he disposed of his interests in these lands.  Based on the 1932 decree issued by the Colorado state water court, intermittent use of these waters for irrigation occurred through the date of the decree as a result of Paul Ritter, Kirkpatrick's heirs and unspecified others using these waters for irrigation purposes during dry years.  Use of these waters to support the hatchery and maintain a private fishing resort at Emerald Lake also continued through all or most of this period.  Based on this fact, the facts found above and the relative lack of evidence of significant irrigation usage during this period, I find that any irrigation use of Emerald Lake Reservoir through 1932 remained subsidiary to its use for hatchery and fishing resort purposes.

There is no evidence that any waters impounded in Emerald Lake were used for any purpose after 1932.  It is further undisputed that the artificial impoundment of waters in Emerald Lake largely ceased sometime before 1941, as a result of the 1895 dam having washed out, and that any remaining artificial impoundment ended in 1951, when PRID tore out the remainder of the dam.

### Analysis and Conclusions of Law

The United States asserts based on this historical record that PRID's claims must be dismissed because the court lacks subject matter jurisdiction to decide them and that judgment should be entered against PRID and the cross-claim defendants and in favor of the United States on the government's counter and cross-claims because the claimed reservoir right of way never

came into existence under the 1891 Act; or, if it did, that the right of way was subsequently forfeited or abandoned. PRID asserts the court has subject matter jurisdiction to decide its claim to quiet title in the right of way and denies the United States' challenges to its claim. For the reasons stated below, I find and conclude that this court does not have subject matter jurisdiction to quiet title against the United States as requested and, moreover, that the United States is entitled to judgment on the merits of its counter and cross-claims against PRID and the cross-claim defendants.

## I.

I conclude that I lack subject matter jurisdiction to decide PRID's claim to quiet title against the United States. This conclusion is rooted in the undisputed principle that the United States enjoys immunity from suit unless it specifically consents to an action. *United States v. Gamache*, 713 F.2d 588, 591 n.8 (10th Cir. 1983). In the Quiet Title Act, 28 U.S.C. § 2409a, Congress consented to a limited waiver of sovereign immunity for actions by plaintiffs seeking to quiet title to property in which the United States claims an interest. This waiver encompasses actions seeking title to an estate less than fee simple, including easements. *McKay v. United States*, 516 F.3d 848, 850 (10th Cir. 2008). The Quiet Title Act is the exclusive means of asserting jurisdiction over the United States in a quiet title action, *Vincent Murphy Chevrolet Co. v. United States*, 766 F.2d 449, 451 (10th Cir. 1985), and thus is the basis for jurisdiction relied upon by PRID here.

The Quiet Title Act's waiver of sovereign immunity is subject to numerous conditions and exceptions, one of which is the requirement that an action brought under the Act by a private citizen must be commenced within twelve years of "the date upon which it accrued."

28 U.S.C. § 2409a(g).  As a condition on a waiver of sovereign immunity, this requirement must be strictly observed.  *Vincent Murphy*, 766 F.2d at 451.  Failure to comply with this statute of limitations deprives the federal courts of subject matter jurisdiction to decide the merits of the plaintiff's claim.  *Block v. North Dakota*, 461 U.S. 273, 292 (1983); *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1195-96 (9th Cir. 2008).

An action brought under the Quiet Title Act "is deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  28 U.S.C. § 2409a(g).  For non-possessory interests such as an easement on federal land, this accrual date is the date on which the landowner or his predecessors-in-interest knew or should have known that the government, acting adversely to the interests of the plaintiffs, denied the easement's existence or limited its use in a manner demonstrating that the government claimed the right to deny the easement.  *See Skranak v. Castenada*, 425 F.3d 1213, 1216-17 (9th Cir. 2005); *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995); *Werner v. United States*, 9 F.3d 1514, 1516 (11th Cir. 1993).  "Should have known" in this context means the United States' actions would have alerted a reasonable landowner that the government claimed the right to deny the easement.  *See Shultz v. Dep't of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989).  For purposes of determining whether an action was timely filed under the Quiet Title Act, it is irrelevant whether the plaintiff or its predecessors were put on notice of the United States' adverse interest before the statute's enactment in 1972.  *Kingman Reef*, 541 F.3d at 1197; *Stubbs v. United States*, 620 F.2d 775, 780 (10th Cir. 1980).

PRID filed its quiet title claim on July 16, 2004.  Accordingly, in order for this court to have jurisdiction to decide this claim, neither PRID nor its predecessors-in-interest can have had

actual or constructive notice before July 16, 1992 that the United States denied the existence of the claimed reservoir right of way at Emerald Lake.

Originally, the United States argued that PRID received notice of the United States' adverse claim to the purported right of way either when Emerald Lake was included in the Weimenuche Wilderness in 1975, or as a result of its communications with the Forest Service in 1980 concerning reconstruction and expansion of the Emerald Lake dam.  After briefing was completed, however, the United States discovered additional historical documents that, among other things, detail communications in 1915 between PRID's predecessor-in-interest, W.T. Kirkpatrick, and the Forest Service.[8]  These additional documents demonstrate that Kirkpatrick received notice no later than 1915 of the United States' adverse claim to the asserted reservoir right of way in Emerald Lake.  This discovery obviates the need to determine whether the 1975 wilderness designation or the 1980 communications also constituted notice of the United States' adverse claim.

Kirkpatrick received notice of the United States' adverse claim no later than December, 1915, when he received a letter from the Assistant District Forester, dated December 9, 1915, in which the Forest Service official referenced Kirkpatrick's 1895 application for a reservoir right of way under the 1891 Act, before stating:  "[S]aid Act does not authorize the approval of applications for rights of way over unsurveyed lands."  Suppl. Trial Exhs. (Doc. 61), JE 301. Accordingly, he informed Kirkpatrick that his application for an easement right of way would instead be treated as an application for a special use permit.  *Id.*  This letter is consistent with the

---

[8]      The parties stipulated to admission of these newly discovered documents and submitted an update to their joint statement of stipulated facts that included information drawn from them.  *See* Parties' Jt. Status Report (Doc. 58).

report of the Acting District Forester in a letter to the Forest Supervisor, dated October 19, 1915,

that he had informed Kirkpatrick and his business partner, B.W. Ritter, at a recent meeting that

the fact that the land was unsurveyed "precluded the grant of an easement."  *Id.*, JE 298

at US07-0052 to -0053.

The Forest Service enclosed with the December 9 letter a copy of the special use permit it

issued to W.T. Kirkpatrick on that date in response to his 1895 application.  The permit

expressly states that it "is not transferrable . . . and shall terminate upon breach of any of the

conditions herein, or at the discretion of the Forester."  Forest Service Special Use Permit

(Dec. 9, 1915) (JE 108) ¶ 8.  These permit terms effectively deny the existence of a perpetual

easement or right of way on Emerald Lake arising from the 1895 application.

The government's unequivocal statement in the December 9, 1915 letter, as well as the

limitations included in the accompanying special use permit and its statements to Kirkpatrick

and Ritter at the October 19, 1915 meeting, provided actual notice to Kirkpatrick, PRID's

predecessor-in-interest, that the United States denied the existence of the easement or right of

way now claimed by PRID.[9]  This action to quiet title in the claimed right of way therefore

---

[9]      It is of no consequence to this conclusion that PRID asserts that government
approval was not required under the 1891 Act for the claimed right of way to vest in Kirkpatrick.
The question for determining when the cause of action accrued is not whether the United States
provided notice that it denied the specific grounds asserted for the existence of the claimed
property interest, but rather whether it actually or constructively notified PRID or its
predecessor-in-interest that the government denied or limited the claimed right of way in a
manner adverse to their interests.  *See Michel*, 65 F.3d at 132 (cause of action for easement on
federal land accrues when federal government denies or limits use of land in manner adverse to
claimant's interest); *cf. Kingman Reef*, 541 F.3d at 1198 (merits of government's adverse claim
irrelevant to determining when plaintiff or its predecessor knew or should have known of
government's claim); *Stubbs*, 620 F.2d at 781 (rejecting argument that quiet title cause of action
does not accrue if the basis of the government's adverse claim is invalid).  The December 9,
1915 letter and accompanying special use permit more than meet this test.

accrued no later than December 9, 1915, far outside the twelve year limitations period for

bringing this action.  As a result, this condition to asserting suit under the Quiet Title Act has not

been met, and this court lacks subject matter jurisdiction to grant PRID the relief it seeks.

PRID's claims are therefore dismissed.

## II.

The decision to dismiss PRID's quiet title claims does not terminate this matter because

the United States has asserted counter and cross-claims to quiet its title against PRID as well as

the four other individuals and any others who claim an interest in the alleged Emerald Lake

reservoir right of way.  I have independent jurisdiction to decide these claims brought by the

United States.  *See* 28 U.S.C. § 1345.  For the reasons stated below, I find the United States is

entitled to quiet its title to Big and Little Emerald Lake against these claimants.

## A.

It is undisputed that Kirkpatrick's 1895 application for a reservoir right of way at

Emerald Lake was never approved by the Secretary of the Interior.  The United States initially

contends that such approval was required under the 1891 Act for a right of way to vest and,

consequently, that neither Kirkpatrick nor his successors, PRID and the other claimants, obtained

or hold any interest in a reservoir right of way at Emerald Lake.  Whether the United States is

correct in this contention turns on Congress' intent concerning how and when rights of way vest

under the 1891 Act.

The relevant statutory provisions, enumerated as sections 18-21 in the 1891 Act and

codified at 43 U.S.C. §§ 946-949, are as follows:

> Sec. 18.  That the right of way through the public lands and reservations of the United
> States is granted to any canal ditch company, irrigation or drainage district formed for the

purpose of irrigation or drainage, and duly organized under the laws of any State or Territory, and which shall have filed, or may hereafter file, with the Secretary of the Interior a copy of its articles of incorporation or, if not a private corporation, a copy of the law under which the same is formed and due proof of its organization under the same, . . .: *Provided*, That no such right of way shall be so located as to interfere with the proper occupation by the Government of any such reservation, and all maps of location shall be subject to the approval of the department of the Government having jurisdiction of such reservation . . .. [43 U.S.C. § 946.]

Sec. 19.  That any canal or ditch company desiring to secure the benefits of this act [43 U.S.C. §§ 946-949] shall, within twelve months after the location of ten miles of its canal, if the same be upon surveyed lands, and if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the officer, as the Secretary of the Interior may designate, of the land office for the district where such land is located a map of its canal or ditch and reservoir; and upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office, and thereafter all such lands over which such rights of way shall pass shall be disposed of subject to such right of way. . . . [43 U.S.C. § 947.]

Sec. 20.  That the provisions of this act [43 U.S.C. §§ 946-949] shall apply to all canals, ditches, or reservoirs, heretofore or hereafter constructed, whether constructed by corporations, individuals, or association of individuals, on the filing of the certificates and maps therein provided for.  If such ditch, canal, or reservoir has been or shall be constructed by an individual or association of individuals, it shall be sufficient for such individual or association of individuals to file with the Secretary of the Interior, and with the officer, as the Secretary of the Interior may designate, of the land office where said land is located, a map of the line of such canal, ditch, or reservoir, as in case of a corporation, with the name of the individual owner or owners thereof, together with the articles of association, if any there be. . . . : *Provided*, That if any section of said canal or ditch shall not be completed within five years after the location of said section, the rights therein granted shall be forfeited as to any uncompleted section of said canal, ditch, or reservoir, to the extent that the same is not completed at the date of the forfeiture. [43 U.S.C. § 948.]

Sec. 21.  That nothing in this act [43 U.S.C. §§ 946-949] shall authorize such canal or ditch company to occupy such right of way except for the purpose of said canal or ditch, and then only so far as may be necessary for the construction, maintenance, and care of said canal or ditch.  [43 U.S.C. § 949.]

According to rules of construction in place then and today, statutory provisions such as

these "granting privileges or relinquishing rights of the public are to be strictly construed."

*Caldwell v. United States*, 250 U.S. 14, 20 (1919); *Wisconsin Cent. R. Co. v. United States*,

164 U.S. 190, 202 (1896).  Applying this rule to another federal right of way statute, the

Supreme Court elaborated "that such grants must be construed favorably to the government and

that nothing passes but what is conveyed in clear and explicit language - inferences being

resolved not against but for the government."  *Caldwell*, 250 U.S. at 20.

In its 1894 Circular interpreting and applying the irrigation right of way provisions of the

1891 Act, the Department of Interior stated that sections 18-21 of the Act "grant the right of way

through the public lands and reservations of the United States" for the use of canals, ditches and

reservoirs, constructed both before and after the Act, "*upon* the filing *and approval* of the

certificates and maps" required by the ircular and the Act.  1894 Circular, 18 Pub. Lands Dec.

at 168 (emphasis added).  The Department also declared that its purpose in reviewing and

deciding whether to approve right of way applications under the Act was to determine whether

the right of way application complied with the acts of Congress, whether the application

described the proposed works "in such a manner that *the benefits to be granted by the approval*

*of the Secretary of the Interior*" are defined so as to avoid future uncertainty; and whether the

rights of other grantees of the government are properly protected from interference.  *Id.* § 28,

18 Pub. Lands Dec. at 175-76 (emphasis added).  The Circular further provided that until the

Secretary of the Interior approved the application, the right of way applied for would only be

listed as "pending" on the tract book in the local land office.  *Id.* § 25, 18 Pub. Lands Dec.

at 175.  This contemporaneous construction of the 1891 Act by the agency charged with

administering it strongly supports the government's contention that rights of way under the Act

did not vest until approved by the Secretary of the Interior.

Congress' language in amending the 1891 Act right of way provisions a few years later

does the same.  In 1898, Congress expanded the uses that could be made of rights of way granted

under the 1891 Act.  *See* Act of May 11, 1898 ("1898 Amendment"), 30 Stat. 404 (codified at

43 U.S.C. § 951) (repealed Oct. 21, 1976).  In the process, Congress described those rights of

ways as "rights of ways for ditches, canals, or reservoirs heretofore or hereafter *approved* under

the provisions of sections eighteen, nineteen, twenty, and twenty-one of [the 1891] Act."  *Id.*

(emphasis added).

Numerous federal and state court decisions over the last one hundred years and more also

support the United States' contention that government approval is necessary for title to an

1891 Act right of way to vest.  Most notably, in 1917 the Supreme Court, citing both the

1891 Act and the 1898 amendment just described, declared that the 1891 Act "calls for the filing

of maps of location which are to be effective and noted upon the public records when approved

by the Secretary of the Interior."  *Utah Power & Light Co. v. United States*, 243 U.S. 389, 406-

07 (1917).  Accordingly, the Court determined that the private party defendants before it had not

acquired a permanent right of way across federal lands pursuant to the 1891 Act in part because

"no maps of location have been filed or approved" for the claimed right of way.  *Id.*

A few years later, in *Kern River Co. v. United States*, 257 U.S. 147 (1921), the Supreme

Court discussed the means for acquiring a right of way under the 1891 Act in more detail,

stating:  "These rights of way were obtained by making application at the local land office and

ultimately securing . . . approval by the Secretary of the Interior of a map of the ditch, canal or

reservoir. . . . The grant was to become effective when the approval was given; that is to say, the

right of way was then to vest in the applicant for the purpose indicated in the act."  *Kern River*,

-26-

257 U.S. at 151.  The Court relied on this determination to hold that the United States could not administratively cancel its approval of an 1891 Act right of way because title to the right of way had vested.  *Id.* at 150-51.

Consistent with this Supreme Court authority, virtually all reported federal and state case law, from 1899 to the present, construes the 1891 Act as requiring approval of the Secretary of the Interior in order for a vested right of way to be obtained under the Act's provisions.  *E.g.*, *Western Watershed Project v. Matejko*, 468 F.3d 1099, 1103 (9th Cir. 2006) (1891 Act "provided for a vested federal right-of-way for irrigation upon approval of a map by the Secretary of the Interior"); *City & County of Denver v. Bergland*, 517 F. Supp. 155, 187 (D. Colo. 1981) ("case law is clear that a right-of-way under the 1891 Act did not vest or accrue until a proper application was made and approval received"), *aff'd in part, rev'd in part on other grounds*, 695 F.2d 465 (10th Cir. 1982); *Verde River Irrigation & Power Dist. v. Salt River Valley Water Users' Ass'n*, 94 F.2d 936, 941 (9th Cir. 1938) (finding appellant had not obtained a right of way under the 1891 Act because the Secretary of the Interior had not approved a map of the claimed right of way as required by the Act); *United States ex rel. Sierra Land & Water Co. v. Ickes*, 84 F.2d 228, 378 (D.C. Cir. 1936) (rejecting contention that title in 1891 Act right of way can vest without approval of Secretary of the Interior); *United States v. Rickey Land & Cattle Co.*, 164 F. 496, 500 (C.C. Cal. 1908) (denying claimed 1891 Act right of way for lack of approval by the Secretary of the Interior, declaring that "by the express terms of [section 19 of the 1891 Act], in order to acquire a right of way over public lands for canal or reservoir purposes under the act of which it forms a part, it is essential that the map of the location of the canal and the reservoir shall be approved by the Secretary of the Interior.  Such approval is a condition precedent to the

taking effect of the grant of right of way."); *Rasmussen v. Blust*, 122 N.W. 862, 863 (Neb. 1909) ("By the express terms of the [1891 Act], a right of way can only be acquired over vacant government lands upon the approval of the applicant's map by the Secretary of the Interior."); *Nippel v. Forker*, 56 P. 577, 579 (Colo. 1899) (plaintiff's right to the claimed 1891 Act reservoir right of way did not accrue until his map was approved because rights given under the 1891 Act "are conditioned upon the approval by the secretary of the interior of a map and plat of the proposed reservoir filed by the claimant").

        With rare exceptions, discussed below, the Department of Interior has also steadfastly maintained that a private party obtains a vested right of way over federal lands under the 1891 Act only upon the Secretary's approval of the map and other materials required by the Act, and that it has discretion to deny the party's application to serve the purposes of the act or the public interest.  *See, e.g.*, *Offerle*, 77 IBLA 80, 81 (1983) (1891 Act "required prior approval from the Department before a right to use public land could exist"); *Grindstone Butte Project*, 18 IBLA 16, 18-19 (1974) (rejects contention that 1891 Act right of way can vest without Secretary's approval, holding instead that "[t]he Secretary's approval is a prerequisite to the vesting of the grant of a right-of-way under the 1891 Act"); *Calder*, 16 IBLA 27, 33 (1974) (same and affirming that Secretary has discretion to withhold approval if grant is not in the public interest); *Perkins*, 13 IBLA 74, 76 (1973) (1891 Act "provides that a map of the right-of-way must be approved by the Secretary of the Interior before any rights vest in the grantee); Solicitor Opinion, 58 Interior Dec. 29, 38-39 (1942) (rights of way vest under the 1891 Act only upon the Secretary's approval of location maps); *Verde River Irrigation & Power Dist.*, 56 Interior Dec. 98, 99 (1937) (legal effect of Secretary's approval of location map under

1891 Act "is that title to the right of way vests in the applicant"); Regulations: Rights of Way

Upon Unsurveyed National Forest Lands, 43 Pub. Lands Dec. 448, 448 (1914) (filing of location

map under 1891 Act "gives no rights upon the ground"); *California-Nevada Canal, Water &*

*Power Co.*, 40 Pub. Lands Dec. 380, 384 (1912) (title to 1891 Act right of way does not pass

without the Secretary of the Interior's approval of location map, and Secretary may withhold

approval in the public interest); *Whitney*, 33 Pub. Lands Dec. 646, 647 (1905) (denies application

to expand existing 1891 Act reservoir right of way, stating denial is within Secretary's discretion

to protect the public interest); *Rio Grande Dam & Irrigation Co.*, 19 Pub. Lands Dec. 256, 256

(1894) (grant of right of way under 1891 Act becomes effective upon Secretary's approval of

maps); 1894 Circular, 18 Pub. Land Dec. at 168 (right of way under 1891 Act granted "upon the

filing and approval of the certificates and maps" required by the Act).

### B.

PRID makes two arguments challenging the conclusion that title to a right of way under

the 1891 Act vests only upon approval of the Secretary of Interior.  First, it contends that

section 19 of the Act, which requires claimants to submit a right of way map and other materials

for approval of the Secretary of the Interior, is separate and independent from section 18 of the

Act, the section in which Congress declared its grant of the right of way.  As a result, PRID

argues, section 19's submission and approval requirements are of no consequence to the question

of when and how the grant declared in section 18 vests.

I disagree.  It is well established that sections 18 and 19 of the 1891 Act do not confer

rights independent of each other and that they must be construed together.  *See Ickes*, 84 F.2d at

230; *Union Land & Stock Co. v. United States*, 257 F. 635, 639 (9th Cir. 1919); *Roth v. United*

*States*, 326 F. Supp. 2d 1163, 1169 (D. Mont. 2003); *see also* 1891 Act § 19 (Secretary's approval part of process necessary "to secure the benefits" of the Act).  The Secretary's approval of the claimant's right of way map as provided in section 19 is necessary, moreover, for the right of way to be recorded and enforceable against the owner of the lands on which the right of way is located.  *See* 1891 Act § 19 (43 U.S.C. § 947).  Contrary to PRID's suggestion, this legal protection is not trivial but is an attribute of having acquired title to the right of way.  Finally and perhaps most importantly, and as discussed in more detail below, PRID's argument that Department of the Interior approval is not required is inconsistent with the language of the 1891 Act as amended and with the Supreme Court and other authority that construes the 1891 Act as requiring approval by the Secretary of the Interior in order for the right of way authorized by the Act to vest.

PRID's second argument in disputing that title to a right of way under the 1891 Act requires approval by the Secretary of Interior is that even if vested rights can be obtained under the Act upon the Secretary's approval of a right of way map, the Act also provides an alternate, entirely separate means for acquiring vested title to an irrigation right of way.  This alternate means is for claimants to enter federal lands and simply construct a canal, ditch or reservoir.  Accordingly, PRID argues, Kirkpatrick's act of constructing the 5-foot dam at the outlet of Big Emerald Lake in 1895 established a vested reservoir right of way under the authority of the 1891 Act, without regard to the fact that his application for a reservoir right of way at the lakes was never approved by the Secretary of the Interior.

PRID's "vesting by construction" theory is founded on two relatively recent federal district court decisions, *Overland Ditch & Reservoir Co. v. United States*, No. Civ. A 96 N 797,

1996 WL 33484927 (D. Colo. Dec. 16, 1996), and *Roth v. United States*, 326 F. Supp. 2d 1163

(D. Mont. 2003), *vacated upon joint motion* (D. Mont. Nov. 24, 2008), as well as the authority

and reasoning set out in these decisions.  For the reasons stated below, I do not find these

decisions or their rationale persuasive.

  Both *Overland Ditch* and *Roth* were quiet title actions brought against the United States

by private parties claiming a vested right of way pursuant to the 1891 Act.[10]  In both cases, the

rights of way claimed by the plaintiffs were for a reservoir and ditches that had been constructed

on unsurveyed federal lands and had not been approved by the Secretary of the Interior.  On

cross-motions for summary judgment, the *Overland Ditch* and *Roth* courts held the 1891 Act did

not require government approval for a right of way to vest on unsurveyed lands and that a vested

right of way could be obtained on these lands solely by the act of constructing a ditch, canal or

reservoir.  *Overland Ditch*, 1996 WL 33484927, at *10-11; *Roth*, 326 F. Supp. 2d at 1169-73.

On this basis, the courts quieted title to the claimed rights of way against the United States.

*Overland Ditch*, 1996 WL 33484927, at *11; *Roth*, 326 F. Supp. 2d at 1173.

  These courts' conclusions cannot be reconciled with the plain language of the 1891 Act.

Section 18 of the Act expressly provides that any right of way sought across reserved federal

lands is subject to the approval of the federal department having jurisdiction of such reservation.

1891 Act § 18 (43 U.S.C. § 946).  Thus, at minimum, approval by the federal department having

jurisdiction over reserved or withdrawn lands is required before an 1891 Act right of way can

---

[10]  In both cases the courts found they had subject matter jurisdiction to decide this question because neither the right of way claimants nor their predecessors-in-interest had notice that the United States claimed an interest adverse to the claimed right of way outside of the statute of limitations period.  *See Overland Ditch*, 1996 WL 33484927, at *7-8; *Roth*, 326 F. Supp. 2d at 1168.

vest across these lands, including on any reserved or withdrawn lands that are unsurveyed. *See, e.g.*, *id.*; *United States v. Henrylyn Irrigation Co.*, 205 F. 970, 972 (D. Colo. 1912); *California-Nevada Canal, Water & Power Co.*, 40 Pub. Lands Dec. 380, 384 (1912); *McKnight*, 13 Pub. Lands Dec. 165 (1895); *Rimrock Canal Co.*, 9 IBLA 333, 341 (1973) (applying section 18 reservation provision to withdrawn lands).

Congress has further indicated its intent that approval by the Secretary of the Interior is a precondition to establishment of a vested 1891 Act right of way on all federal lands, including those not subject to Section 18's special approval requirements for reserved and withdrawn lands. Section 19 of the 1891 Act states that "[a]ny canal or ditch company desiring to secure the benefits" of its right of way provisions "shall" file a map of the claimed ditch, canal or reservoir and that "upon the approval thereof by the Secretary of the Interior" the right of way will be recorded and "thereafter all such lands over which such rights of way pass shall be disposed of subject to such right of way."  1891 Act § 19 (43 U.S.C. § 947).  Section 20 extends the Act's benefits and requirements to all canals, ditches and reservoirs constructed before or after the Act's passage and specifies how individuals that have already constructed a ditch, canal or reservoir can comply with these requirements and thus obtain the Act's benefits. *See id.* § 20 (43 U.S.C. § 948).  Because the "benefits" of the right of way provisions of the 1891 Act indisputably include the grant of the right of way, anyone seeking to secure this grant must comply with these filing and approval requirements.

To the extent there is any ambiguity in sections 18-20 of the 1891 Act regarding the necessity of obtaining approval of the Secretary of Interior for a vested right of way to be obtained, this doubt was removed in 1898 when Congress authorized additional uses of rights of

way "heretofore or hereafter *approved*" under the 1891 Act.  1898 Amendment

(43 U.S.C. § 951) (emphasis added).  If Congress had intended for vested rights of way to arise

under the 1891 Act without approval of the Secretary of Interior, it could have referred to these

rights of way in the 1898 Amendment as having been "granted," "secured" or "obtained" under

the Act.  That it did not use these more general terms, but rather referred to rights of way that

had been "approved," demonstrates that Congress intended for the map filing and approval

process set out in the 1891 Act to be a prerequisite to obtaining a vested right of way under its

provisions.

The notion that vested rights can be obtained without government approval is also

contrary to the Supreme Court's decisions in *Utah Power & Light* and *Kern River* interpreting

and applying the 1891 Act, as amended in 1898, as well as the host of other judicial and

administrative decisions and regulations described above.  It is noteworthy that in a number of

these cases, the canals, ditches or reservoirs at issue had already been fully or partially

constructed, yet the courts did not view this fact as material and instead looked to whether the

right of way had been approved to determine whether an 1891 Act right of way existed.  *See,*

*e.g.*, *Rasmussen*, 122 N.W. at 862-63 (no right of way acquired under 1891 Act for constructed

ditches and reservoir because Secretary of Interior had not approved right of way map); *Nippel*,

56 P. at 578-79 (party that constructed and then enlarged reservoir on public lands did not obtain

rights under 1891 Act until Secretary of Interior approved his right of way application); *Perkins*,

13 IBLA at 76 (holder of existing ditch had no vested rights under 1891 Act without Secretary's

approval of right of way map); *see also Utah Power & Light*, 243 U.S. at 389, 407 (no rights

existed under 1891 Act for constructed reservoirs and other water works in part because no maps

of location had been filed with or approved by the Secretary of the Interior).

The *Overland Ditch* and *Roth* decisions for the most part ignore this overwhelming

authority, as well as the language of the 1891 and 1898 acts themselves.[11]  Instead they invoke

dicta in one or more of a trio of Department of Interior decisions issued in a six month period in

1909-1910, as well as a decision by the Supreme Court of the Territory of New Mexico in this

same period, as support for the proposition that title to an 1891 Act right of way on unsurveyed

federal land vests on construction.

The three Department of Interior decisions are *Sierra Ditch & Water Co.*, 38 Pub. Lands

Dec. 547 (1910), *De Weese v. Henry Investment Co.*, 39 Pub. Lands Dec. 27 (1910) and

*Anderson v. Spencer*, 38 Pub. Lands Dec. 338 (1909).  Two of these decisions, *De Weese* and

*Anderson*, address the priority of right between private parties competing for approved rights of

way under the 1891 Act, while the third, *Sierra Ditch*, affirmed the Department of the Interior's

rejection of an application for an 1891 Act right of way within Yosemite National Park.  In each

of these decisions, First Assistant Secretary Pierce stated in dicta that vested rights under the

1891 Act may be secured by construction of an irrigation ditch, canal or reservoir over federal

lands, without obtaining Department of Interior approval.  *See Sierra Ditch*, 38 Pub. Lands

---

[11]        The court in *Roth* acknowledges that some courts have determined that a right of
way does not arise under the 1891 Act without the approval of the Secretary of the Interior, but
attempts to distinguish these cases on the ground that their facts did not involve constructed
water works or rights of way claimed on unsurveyed lands.  *See Roth*, 326 F. Supp. 2d at 1173-
74 (referencing *Rickey Land*, 164 F. at 500, *Ickes*, 84 F.2d at 229, *Grindstone Butte Project*,
638 F.2d 100, 102 (9th Cir. 1981), and  *Kern River*, 257 U.S. at 151).  For the reasons set out
previously and in this section, neither of these distinctions are persuasive or cast doubt on the
proposition, stated in the referenced cases, that rights of way vest under the 1891 Act only upon
the approval of the Secretary of the Interior.

Dec. at 548-49; *De Weese*, 39 Pub. Lands Dec. at 33; *Anderson*, 38 Pub. Lands Dec. at 340.  The

dicta in these decisions does not distinguish between establishment of 1891 Act rights of way on

surveyed and unsurveyed lands.

In *United States v. Lee*, 110 P. 607 (N.M. 1910), a divided New Mexico Territory

Supreme Court affirmed dismissal of the United States' complaint seeking to enjoin the

defendant from constructing and maintaining ditches and canals on unsurveyed lands of the

United States without first obtaining approval from the Secretary of the Interior.  *Id.* at 612.  The

basis of the court's decision was its determination that "Congress intended that any person may

go upon unsurveyed public lands of the United States lawfully, and construct irrigating ditches,

canals, or reservoirs . . . and that the grant becomes fixed so far as the right of way is concerned

upon the construction of the ditch or canal, the approval of the Secretary afterwards being in the

nature of a confirmation of the grant and completion of title thereof upon the records kept by the

government." *Id.* at 610.  At the same time, the New Mexico court expressly acknowledged that

a right of way under the 1891 Act could only be obtained on surveyed lands upon the approval of

the Department of Interior.  *See id.* at 609.

Only two of these decisions, *Lee* and *De Weese*, provide any rationale for its statements

regarding acquisition of vested 1891 Act rights of way by construction.[12]  *See Lee*, 110 P. at 609-

12; *De Weese*, 39 Pub. Lands Dec. at 32-33.  The rationale stated in these cases, repeated in the

*Overland Ditch* and *Roth* decisions and by PRID here, has two bases, neither of which withstand

scrutiny.

---

[12]        There is some question whether *Lee* even stands for this proposition given its
statements that the 1891 Act right of way for a constructed ditch or reservoir "may become
permanent" "by the approval" of the Secretary and that government approval was still necessary
for "completion of title" to the right of way.  *Lee*, 110 P. at 610, 611.

The first basis is the Supreme Court's decision in *Barlow v. Northern Pacific Railway Co.*, 240 U.S. 484 (1916), and before that, in *Jamestown & Northern Railroad Co. v. Jones*, 177 U.S. 125 (1900), that a railroad company could secure a right of way grant through federal lands under the Act of March 3, 1875 ("1875 Act"), 18 Stat. 482 (codified at 43 U.S.C. §§ 934-939) (repealed Oct. 21, 1976), either by construction of the railroad on the claimed right of way or by filing a map of the planned right of way with the local land office in advance of construction.[13]  *See Barlow*, 240 U.S. at 485; *Jamestown*, 177 U.S. at 131.  The courts in *Overland Ditch, Roth* and *Lee,* and the Department of the Interior in *De Weese*, declared that the 1875 and 1891 Acts are so similar, in fact nearly identical according to the courts in *Roth* and *Lee*, that the Supreme Court's statements in *Barlow* and *Jamestown* concerning an 1875 Act railroad right of way arising solely by construction are also applicable to and binding with respect to determining Congress' intent in granting rights of way2 under the separate 1891 Act. *See Roth*, 326 F. Supp. at 1171-72, 1174; *Overland Ditch*, 1996 WL 33484927, at *11; *Lee*, 110 P. at 609-10; *De Weese*, 39 Pub. Lands Dec. at 32-33.

The premise of this analysis, that the 1875 and 1891 Acts are nearly identical with respect to the grant of rights of way across federal lands, is false.  While Congress used similar language in both Acts to describe the process by which maps of claimed rights of way and other materials were to be filed with and approved by the Secretary of the Interior, *compare* 1875 Act, §§ 1, 4 (43 U.S.C. §§ 934, 937) *with* 1891 Act, §§ 18, 19 (43 U.S.C. §§ 946, 947), it also added provisions to the 1891 Act that materially distinguish it from the 1875 Act.  First, Congress

---

[13]      The Court held that a railroad could acquire a right of way by construction under the 1875 Act on either surveyed or unsurveyed lands.  *See Barlow*, 240 U.S. at 485; *Jamestown*, 177 U.S. at 132.

added the proviso to the granting section of the 1891 Act, section 18, that expressly requires federal executive approval as a precondition to a right of way grant over reserved and withdrawn federal lands, and imposes a duty on the relevant federal executive to determine whether use of the right of way will interfere with the federal government's occupancy of these lands. *See* 1891 Act § 18 (43 U.S.C. § 946); *Henrylyn Irrigation*, 205 F. at 972; 1894 Circular § 28, 18 Pub. Lands Dec. at 175. Second, in amending the 1891 Act in 1898, Congress stated that rights of way established under the 1891 Act are "approved." 1898 Amendment (43 U.S.C. § 951). The 1875 Act and the legislation related to it contain no such language. These differences go directly to the question of whether Congress intended to condition the grant of rights of way under the 1891 Act on the Department of the Interior and other federal government approval of the grant, and indicate this was Congress' intent. Accordingly, reliance on the Supreme Court's decisions in *Barlow* and *Jamestown* concerning the means by which railroad rights of way may be acquired under the 1875 Act is misplaced.

The second major justification, advanced in *Roth*, *Overland Ditch* and *Lee,* for construing the 1891 Act to allow rights of way to vest by construction, without Department of Interior approval, is that otherwise no right of way could be granted under the Act on unsurveyed lands because the Act does not authorize the Secretary to approve rights of way on these lands. *See Roth*, 326 F. Supp. 2d at 1172; *Overland Ditch*, 1996 WL 33484927, at *11; *Lee*, 110 P. at 611 12. *Roth* and the other decisions assume Congress cannot have intended this result, because then individuals and companies that had constructed irrigation canals, ditches or reservoirs on unsurveyed lands would be in a "legal purgatory" without legal protection for their investment or a means of acquiring title to irrigation rights of way on these lands. *See Roth*,

326 F. Supp. 2d at 1173, 1174; *Lee*, 110 P. at 611.  As a result, the courts declared, "it made little sense," *Roth*, 326 F. Supp. 2d at 1173, and was unreasonable, *Lee*, 110 P. at 611, to construe the 1891 Act as only allowing vested rights with government approval.  Searching for an alternative to alleviate these concerns, these courts held that Congress must have intended for construction on a right of way claimed on unsurveyed public lands, without more, to be sufficient to vest title in the right of way under the 1891 Act.[14]  *See Roth*, 326 F. Supp. 2d at 1173, 1174; *Overland Ditch*, 1996 WL 33484927, at *11-12; *Lee*, 110 P. at 611-12.

This rationale runs afoul of the rule that statutes granting privileges or relinquishing rights of the public cannot be construed "by reason and analogy" to the detriment of the public's rights.  *Caldwell*, 250 U.S. at 21; *see Wisconsin Central*, 164 U.S. at 202.  Instead, right of way statutes such as the 1891 Act must be strictly construed, so that "nothing passes but what is conveyed in clear and explicit language - inferences being resolved not against but for the government." *Caldwell*, 250 U.S. at 21.  Here, neither the *Roth*, *Overland Ditch* and *Lee* courts nor PRID point to any "clear and explicit" language in the 1891 Act that grants a vested right of way across unsurveyed federal lands based solely on construction of reservoirs, ditches or canals.  Nor do they identify any evidence or reason supporting the assumption that Congress did *not* intend to withhold a right of way grant under the 1891 Act until the lands on which the right of way was located were surveyed.  In fact, it is difficult to discern a reason why Congress would allow an 1891 Act right of way to vest on unsurveyed land without the same kind of government scrutiny and approval it required for obtaining title to such a right of way on surveyed lands.

---

[14]     Contrary to these courts' other rationale for allowing vesting by construction, this justification thus indirectly acknowledges that approval by the Secretary of the Interior *is* required for rights of way to be established under the 1891 Act on surveyed lands.

The assumption that this required, strict construction of the 1891 Act unfairly deprives private parties of the opportunity to obtain a vested right of way for canals, ditches and reservoirs constructed on unsurveyed lands is also unjustified.  The historical record in this case indicates that the public understood at the time of Kirkpatrick's right of way application that he could not obtain permanent rights to the dam and reservoir under the 1891 Act unless and until the area encompassing Emerald Lake was surveyed.  *See* JE 20 at US 0366-68; JE 21 at US 0374.  The Department of Interior's comprehensive 1894 Circular of regulations implementing the 1891 Act also makes no provision for rights of way coming into existence under the Act without having passed through the Department's review and approval process.  This evidence indicates that private parties, like Kirkpatrick, who decided to proceed with construction of irrigation canals, ditches and reservoirs on unsurveyed federal lands did so knowing that acquisition of a permanent, vested right of way under the 1891 Act was not guaranteed.[15]

## C.

For the reasons stated above, I hold that the grant of a right of way pursuant to the 1891 Act vests against the United States only if the map of the right of way and other application

---

[15]     The record also does not support the assumption that persons seeking rights of way over unsurveyed lands under the 1891 Act received no legal protection for their efforts.  As a result of the 1914 joint regulations issued by the Departments of Interior and Agriculture, for example, all pending applications for 1891 Act rights of way across unsurveyed national forest lands were deemed applications for a special use permit for maintenance or construction of the subject canals, ditches or reservoirs, which would be granted "unless there should be good reasons for disapproving the application."  Regulations, 43 Pub. Lands Dec. 448 (Nov. 14, 1914).  This method of authorizing private use of unsurveyed public lands provided claimants with some measure of legal protection, and is consistent with Congress' shift shortly after the 1891 Act toward a public land management system that granted revocable licenses for rights of way instead of permanent property interests.  *See Kern River*, 257 U.S. at 152 (describing Act of May 14, 1896, 29 Stat. 120, and Act of February 15, 1901, 31 Stat. 790 (codified at 43 U.S.C. § 959)); *Lee*, 110 P. at 612-13 (Abbott, J., dissenting) (discussing Act of February 15, 1901).

materials required by the Act have been approved by the Secretary of the Interior in accordance

with the Act.  As it is undisputed that the Secretary has not approved the reservoir right of way

claimed by PRID and the cross-claim defendants at Emerald Lake, I find these parties do not

hold a vested interest in the claimed right of way.[16]

III.

The United States is also entitled to quiet title against PRID and the cross-defendants on

the separate ground that Kirkpatrick did not obtain any rights under the 1891 Act because he did

not establish and use the alleged reservoir right of way for the purposes authorized by the Act.

The Supreme Court held in *Kern River* that the Act of 1891 granted a right of way through the

public lands and reservations of the United States for canals, ditches and reservoirs employed

"for the purpose of irrigation but not for any other purpose."  257 U.S. at 151.  In 1898, Congress

amended the Act to permit canals, ditches and reservoirs on 1891 Act rights of way to be used

for other purposes "of a public nature," but only as long as they were "subsidiary to the main

purpose of irrigation."  1898 Amendment (43 U.S.C. § 951); *see Kern River*, 257 U.S. at 151.

By statute, compliance with these use restrictions was a precondition to acquisition of a right of

way under the Act.  1891 Act § 18 (43 U.S.C. § 946); *see, e.g., Kern River*, 257 U.S. at 152-53;

*Calder*, 16 IBLA at 33 (right of way under 1891 Act does not vest until all statutory

requirements have been met); *Lee*, 110 P. at 611 (even under theory that title to 1891 Act right of

---

[16]       PRID's suggestion in its sur-reply that some Forest Service and/or Department of
Interior officials "acquiesced" to the claimed right of way and thereby caused it to vest finds
scant support in the factual record and is without legal merit in any event.  The United States is
neither bound nor estopped by the acts of its officers or agents to grant rights in public lands that
are not conferred by statute.  *See Caldwell*, 250 U.S. at 22; *Utah Power & Light*, 243 U.S.
at 408-09; *Kern River Company*, 38 Pub. Lands Dec. 302, 309 (1909).

-40-

way on unsurveyed lands vests on construction, right of way only attaches if main purpose of right of way is irrigation).[17]

I have found as a matter of fact in this case that Kirkpatrick, the predecessor-in-interest to PRID and the other claimants to the alleged reservoir right of way, did not use the claimed right of way exclusively for irrigation purposes in 1895, when he constructed the Emerald Lake dam and applied for an 1891 Act right of way, or even mainly for irrigation purposes at any point thereafter.  Instead, the exclusive and then main purpose of the claimed reservoir right of way was maintenance and operation of a fish hatchery and private fishing resort at Emerald Lake, with any irrigation use of the reservoir being subsidiary to these other uses.[18]  Accordingly, Kirkpatrick did not, under any theory, acquire a vested right of way under the 1891 Act as claimed by his successors-in-interest.[19]

---

[17]     The Department of Interior determined whether this statutory requirement had been met as part of its review and approval of applications for rights of way under the 1891 Act. *See* 1894 Circular § 28, 18 Pub. Lands Dec. at 175.  It routinely denied pre-1898 applications for rights of way that were not exclusively devoted to irrigation purposes.  *See, e.g.*, *South Platte Canal & Reservoir Co.*, 20 Pub. Lands Dec. 154, 156 (1895); *Chaffee County Ditch & Canal Co.*, 121 Pub. Lands Dec. 63, 65 (1895); *Marr*, 25 Pub. Lands Dec. 344 (1897).

[18]     Fish culture and maintenance of a private fishing resort do not qualify as uses "of a public nature" that may be maintained on an 1891 Act right of way, even where they are subsidiary to the main purpose of irrigation.  *See United States v. Big Horn Land & Cattle Co.*, 17 F.2d 357, 366 (8th Cir. 1927) (1891 Act does not grant reservoir right of way for a private fishing preserve); *Calder*, 16 IBLA at 38-39 (1891 Act does not authorize rights of way for fish culture or "exclusive piscatorial privileges").

[19]     Even if Kirkpatrick had acquired a vested reservoir right of way under the 1891 Act, the United States would be entitled to a decree declaring that right of way forfeited because the claimed Emerald Lake Reservoir, to the extent it has even existed in the last 65 years, ceased to be used for irrigation or any other purpose no later than 1941, when PRID discovered the 1895 dam had washed out.  A right of way that has vested under the 1891 Act is subject to forfeiture "in the event the grantee ceased to use or retain it for the purposes indicated" in the 1891 Act.  *See Kern River*, 257 U.S. at 154-55; *Nevada Irrigation Dist.*, 52 Pub. Lands Dec. 371, 375 (1912).

IV.

For the reasons stated above, PRID's claims in this action are dismissed for lack of subject matter jurisdiction.  With respect to the United States' counterclaim and cross-claims, I direct that judgment be entered in favor of the United States and against PRID and the cross-claim defendants.  The United States shall prepare a proposed form of judgment and submit it to the court within 10 days of entry of this decision.

IT IS SO ORDERED.

Dated this 18th day of September, 2009.

s/ John L. Kane
John L. Kane, Senior District Judge
United States District Court